Manlt, J.
 

 The slave cannot be the owner of property, money or any material thing, except in a low and qualified sense. The ownership of the slave, as recognised by statute, in specific articles for his own use, is to be understood in this sense, of course, subject to the paramount right of property in the master, as incidental to his property in the slave himself. In the management and control of slaves, the owner allows gratuities for extra fidelity and diligence^ and through means
 
 *176
 
 of these, slaves are permitted to supply themselves and their families with such tilings as may contribute to their greater comfort, health and happiness. We are not aware of any limitation to this right of the master to indulge his slaves, provided the indulgence do not violate any express provision of law, or offend against a just public policy.
 

 The case before us is not an allotment of specific articles, but an investment of the earnings of the slave, in a bond payable to the master’s agent
 
 for the use of the
 
 slam, and the question is, whether this trust in the master, as thus admitted by him, is against public policy.
 

 A contract, void for such reason, is, where the toleration of it would work an injury or inconvenience to the public, and, testing the transaction by this definition, we do not perceive the ground upon which it should be set aside. As long as the master keeps the actual, as well as the legal control of the fund, it can no more endanger the public safety, than any other portion of his property. If the slave enjoy any part of it, it is as a gratuity from the master and not as a matter of right. The fact, that the slave is nominally the owner of it, is of no public concern.
 

 The
 
 alien
 
 enemy, not domiciled in the country, cannot sue in our courts and recover debts, because it is against public policy, and yet a trustee, competent to sue, may recover upon a bill, payable to himself, for the use of an alien enemy. The Court, in the case referred to,
 
 Dombay
 
 v. Morehead, 6 Taunton,
 
 332,
 
 says, it will not enquire what use the trustee proposes to make of the money. The
 
 status
 
 of the slave is not unlike that of the alien in social disabilities, and the same indulgence may be as safely extended to the master, in one case, as the trustee in the other. In the case of the master, there is less reason to enquire into the use that is to be made of it. For, whether he take it to himself, or put it to the use of the slave, the Court has the highest assurance (viz., the interest of the owner) that nothing will be done to injure the slave, or the rights of the public.
 

 The case of
 
 Barker
 
 v. Swain,
 
 4
 
 Jones’ Eq. 220, is
 
 distin
 
 
 *177
 
 guishable from the case before us. That was a cáse -ip^whi^ a bill was filed by one who possessed a sum of money belonging to a slave, calling upon the owner of the slave, and a person who was the creditor of the slave, for the property which had been sold to produce the fund, to interplead and settle to whom it belonged. It appeared the slave had been going at large and hiring his own time, whereby he had been enabled to make the purchase from one of the defendants, of the property spoken of. The Court held that neither the master nor the creditor of the slave was entitled to the money, because it had sprung out of a violation of the law by both. A violation by the creditor, in trading with the slave without permission, and a violation by the master, in allowing the slave to go at large, having the control of his own time. The case before us, now, has no demerit of this sort. The slave, for aught that appears, was continually under the dominion of his master or his agent, and employed about his lawful commands.
 

 That he was in an eminent degree industrious and economical, is apparent from the large sum which he accumulated, and that he possessed a proper spirit of subordination, as well as a proper trust and confidence in his owner, is apparent from the disposition he makes of it. The history of the transaction discloses, prominently, characteristics of the relation between master and slave, not unfreqnently found upon well governed plantations — relations of mutual good will — of respectful and faithful service on the part of the slave, and of a watchful and just care of the slave’s comfort and happiness on the part of the master. This is accordant, in our view, with a just public policy — not detrimental to it.
 

 The duties and obligations belonging to the relation of master and slave, are mutual and diverse. Among them, on the part of the master, is that of giving strength and moral health, and consequent permanence to the system itself, as a part of the foundation upon which rest our social affairs. This can only be done by carrying into the domestic government of slaves a principle of justice, administered in a spirit of benevolence.
 

 
 *178
 
 "While industry, submission and obedience, are requiréd on the one hand, a provident attention to their wants, and the application of every lawful stimulus to brace them up to a fulfilment of the duties of their station, are due on the other. Among the incentives to a virtuous and diligent course of conduct, stands prominent a system of rewards, which, we confidently think, may be developed to any desired extent, without violating either the express law, or general policy of the country.
 

 The recovery of the note does not seem to us to be against public policy. There has been no violation of our statute law in the transaction from which it originated. The parties to it are competent to contract, and have contracted, and we see no reason why it should not be recovered. The judgment below is reversed, and there must be a judgment here for the plaintiff.
 

 Per Curiam,
 

 Judgment reversed.